UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

BRIAN BAGLEY,

                                  Plaintiff,                      9:20-cv-00683 (BKS/DJS)

v.

GARY SLATTERY, Correctional Officer; JUSTIN
QUAIN, Correctional Officer; and STEVEN BEAURY,
Correctional Officer,

                                  Defendants.
_____

**Appearances:**

*For Plaintiff:*
George H. Lowe
Hannah K. Redmond
Bond, Schoeneck & King, PLLC
One Lincoln Center
110 West Fayette Street
Syracuse, New York 13202

*For Defendants Slattery and Quain:*
Letitia James
Attorney General of the State of New York
Lela M. Gray
Assistant Attorney General
The Capitol
Albany, New York 12224

**Hon. Brenda K. Sannes, Chief United States District Judge:**

## MEMORANDUM-DECISION AND ORDER

### I.    INTRODUCTION

       Plaintiff Brian Bagley brought this 42 U.S.C. § 1983 action stemming from his

incarceration at Great Meadow Correctional Facility. (*See* Dkt. No. 85). Defendants Gary

Slattery and Justin Quain were correctional officers ("COs") at Great Meadow during Plaintiff's

incarceration there. Presently before the Court is Defendants' motion for partial summary judgment seeking dismissal of Plaintiff's First Amendment claim.[1] (Dkt. No. 121). The motion is fully briefed, and the Court heard oral argument on February 9, 2026. (Dkt. Nos. 121-3, 122, 123). For the reasons that follow, the Court defers decision on the motion pending additional briefing.

## II.   FACTS[2]

In January 2017, a New York jury convicted Plaintiff of various crimes, including predatory sexual assault against a minor; a state judge sentenced him to 36 years' to life imprisonment. (*See* Dkt. No. 122-2, at 13–15, 38). After serving his first two months at Elmira Correctional Facility, Plaintiff was incarcerated at Great Meadow from March 20 through April 5, 2017. (*Id.* at 20–21; Dkt. No. 121-2, at 3). He then stayed at the Central New York Psychiatric Center ("CNYPC"), until his June 20 transfer to Sullivan Correctional Facility. (Dkt. No. 121-2, at 3). During the relevant events, Slattery and Quain worked as COs at Great Meadow. (*See* Dkt. No. 122-3, at 60).

### A.   Plaintiff's Arrival at Great Meadow

At Elmira, fellow prisoners repeatedly "threatened and harassed" Plaintiff because of the nature of his conviction. (*See id.* at 40–41). So staff there kept him in protective custody. (*Id.* at 39–40; Dkt. No. 122-2, at 23). When Plaintiff arrived at Great Meadow, he asked to again be placed in protective custody; a sergeant refused this request, however, telling Plaintiff to "go fuck [him]self." (*See* Dkt. No. 122-2, at 23–24, 36–37; *see also* Dkt. No. 122-3, at 37, 40–42).

---

[1] Defendant Steven Beaury has not appeared. All references to "Defendants" in this decision therefore refer only to Slattery and Quain.

[2] The facts, which the Court construes in the light most favorable to Plaintiff as the nonmoving party, are drawn from the parties' exhibits submitted in connection with the summary judgment motion. *See Gilles v. Repicky*, 511 F.3d 239, 243 (2d Cir. 2007).

2

Plaintiff entered general population. (Dkt. No. 122-2, at 40; Dkt. No. 122-3, at 42). Around the same time, another prisoner threatened and attempted to extort him. (Dkt. No. 122-2, at 44–45; *see also* Dkt. No. 122-3, at 28–36, 53–60).

In light of these experiences, Plaintiff asked Great Meadow staff on March 22 to see a mental health counselor. (Dkt. No. 122-2, at 41; Dkt. No. 122-3, at 45–48). He explained to the counselor that he "felt fearful for [his] life" and "really needed . . . some help." (Dkt. No. 122-2, at 41, 42; Dkt. No. 122-3, at 50–52). The counselor listened, but explained that she was "getting ready to close down and . . . would make sure that somebody saw [Plaintiff] the next morning," March 23. (*See* Dkt. No. 122-2, at 42; *see also* Dkt. No. 122-3, at 52–53). That day, Plaintiff waited to be taken back; Defendants Slattery and Quain came to his cell but never returned him to the mental health office. (Dkt. No. 122-2, at 42–43, 46; Dkt. No. 122-3, at 60–61, 63).

### B.      Slattery's and Quain's Alleged Misconduct

When Slattery and Quain arrived, Plaintiff lay "on [his] bed . . . reading [his] Bible." (Dkt. No. 122-3, at 63, 65, 67; Dkt. No. 122-2, at 43). "[T]hey told [Plaintiff] to stand up," and Slattery punched Plaintiff's stomach, proclaiming: "[t]his is what rap[e]os get." (Dkt. No. 122-3, at 68–73). At that time, Plaintiff did not recognize the two—when he looked for their name tags, one responded: "what did you think, I'm fucking stupid? Of course, I took my nametag off." (Dkt. No. 122-2, at 46; *see also* Dkt. No. 122-3, at 63, 64, 67). Plaintiff testified in 2021:

> They asked me if I was a creep. And I said I didn't understand what that meant. And he says . . . are you a fucking child rapist? And I said no. And he says you're a fucking liar, too. And I said no. I said I'm not guilty of my crime just because I was convicted [of] it. And he says get up. So the one pulled me by my shirt and I went through my gate, and he threw me up against the wall.

(Dkt. No. 122-2, at 49; *see also* Dkt. No. 122-3, at 73–74 (transcript of Plaintiff's 2025 deposition containing similar testimony)).

3

The two then told Plaintiff to move against the wall for a "pat frisk." (Dkt. No. 122-2, at 49; Dkt. No. 122-3, at 73, 75). Slattery frisked Plaintiff; although it started professionally, Slattery "bashed [Plaintiff's] testicles" when moving his hands up Plaintiff's left leg. (*See* Dkt. No. 122-3, at 80–83; Dkt. No. 122-2, at 49). After Slattery repeated this on Plaintiff right leg and again on his left, Quain interjected, "you're not doing it right." (Dkt. No. 122-3, at 83–84, 87; Dkt. No. 122-2, at 49–50). Quain repeated the same movement, striking Plaintiff's testicles twice "much harder than" Slattery. (Dkt. No. 122-3, at 88–90; Dkt. No. 122-2, at 50). After running his hand "from the top to the bottom" of Plaintiff's "butt crack," Quain digitally penetrated Plaintiff's anus twice—while Slattery laughed—remarking that Plaintiff "must [have] like[d] it" because he did not react. (Dkt. No. 122-3, at 93–98; Dkt. No. 122-2, at 50).

Immediately after, Quain instructed Plaintiff to pull up his pants, "stand on the wall," and face his cell. (Dkt. No. 122-2, at 50; *see also* Dkt. No. 122-3, at 99–101). At his 2021 deposition, Plaintiff explained what happened next as follows:

> I stood there and I watched [one CO, later identified as Quain,] tear apart my cell. And he says, oh look, it's a picture of your doggie. And he pokes a hole in my dog's mouth and he sticks his penis through it and he pissed in the toilet, all over my stuff that he had thrown in my toilet.
>
> And then he took my jelly and my mayonnaise and was spreading it all over my clothing. And then the other guy took some bags of chips and he was handing it out. He says this is compliments of the rap[e]o in eighteen, he doesn't get any food, fuck him.

(Dkt. No. 122-2, at 50–51). Slattery and Quain then left, but warned Plaintiff that "there[] [would] be hell to pay" if he failed to clean up his cell before they returned in fifteen minutes; once they left, however, Plaintiff "never saw them again." (*Id.* at 51).

Plaintiff told a similar account at his 2025 deposition. He testified then that, once he was up against the wall, "Quain went back into the cage and did some more searching, and then when

4

he was done, they told me to get in my cage and clean the mess up." (Dkt. No. 122-3, at 101). Quain emptied Plaintiff's mayonnaise, jelly, and honey "all out on [Plaintiff's] property," including his "clothing" and "bedding." (*Id.* at 102, 105–06). Plaintiff also testified that Quain "ripped" his Bible and threw part of it in the toilet, and that he destroyed other religious property, including a publication titled "Daily Bread." (*Id.* at 106–08, 138–39).

Finally, in his declaration opposing summary judgment, Plaintiff avers that, when he described Quain urinating on his personal property in his 2021 deposition, his "religious materials were among the items Quain threw in the toilet and urinated on." (Dkt. No. 122-8, ¶ 2).

      **C.**      **Subsequent Events**

While Plaintiff cleaned his cell, a different CO passed by. (Dkt. No. 122-2, at 52). Plaintiff asked to see a mental health counselor because of what had happened, but the CO refused, telling Plaintiff "to go fuck [him]self, cut [his] wrists, and get out of here." (*Id.* at 52, 55–56). Plaintiff made the same request to another staff member who also refused and encouraged him to slit his wrists. (*Id.* at 52–53, 58). Another CO did the same—and this time, when Plaintiff asked how he could cut himself, the CO told him to use his razor and gave him toenail clippers to retrieve the blade. (*See id.* at 53–54, 58–59). That night, Plaintiff attempted suicide; the next morning, staff discovered him bleeding and took him to an outside hospital. (*Id.* at 54–55, 63–65; Dkt. No. 122-3, at 121–22). At the hospital, Plaintiff reported the "assault" and "anal penetration" to a doctor. (Dkt. No. 122-3, at 120).

Plaintiff returned to Great Meadow the same day and stayed in an isolation room. (*Id.* at 121–22; Dkt. No. 122-2, at 66, 70). COs "always told [Plaintiff] to keep [his] fucking mouth shut, don't say anything, and don't make them hurt" him. (*See* Dkt. No. 122-2, at 73–74). Plaintiff had made a "complaint[]" to a nurse, who responded that "he didn't give a fuck." (*Id.* at 74). At some point after his return, a Great Meadow doctor "looked at" Plaintiff's "stitches" and

"bandages." (*Id.* at 75). Plaintiff tried to complain to the doctor about what had happened, but a CO also in the room told the doctor: "don't pay attention to this guy, he's a fucking rap[e]o, so don't worry about it." (*Id.* at 75–76). Plaintiff also told a mental health provider "about the bashing of [his] testicles," thinking that she would report it to a supervisor. (*Id.* at 111, 112–13).

At his 2021 deposition, when asked whether he had ever attempted to "file a grievance about [his] claims in this action," Plaintiff responded that a CO named Catone told him "no," and that "nothing . . . was ever going to become of it." (*Id.* at 167–68). Plaintiff explained that he had told CO Catone that Plaintiff "need[ed] to write a complaint . . . about this stuff that's been happening." (*Id.* at 168). Catone asked "why," and Plaintiff responded, "because this shouldn't be happening to me." (*Id.*). Catone then stated: "I'm not going to give you a piece of paper and a pen. And I mean, I wouldn't give it to you for your parents. Why would I give you a piece of paper or pen in order to fill a complaint out?" (*Id.*; *see also id.* at 27–28 ("So I asked Cantone [if I could file a grievance] and he told me to go fuck myself.")).

Plaintiff transferred from Great Meadow to the CNYPC on April 5, 2017. (Dkt. No. 121-2, at 3). There, Plaintiff made verbal complaints about "everything"; before his 2021 deposition, he had also spoken with personnel from the Department of Corrections and Community Supervision's ("DOCCS") Office of Special Investigations ("OSI"), who visited him "about another incident" concerning a different prisoner. (Dkt. No. 122-2, at 178–80). During that deposition, Plaintiff did not remember whether he provided OSI a written statement, nor did he know whether OSI had "investigate[d] [his] claim." (*Id.* at 191–92). At the CNYPC, he also wrote three letters complaining of his treatment at Great Meadow, but he did not recall what details he had included in those letters. (*See id.* at 175–78). At some point, he received a letter

6

"from DOCCS" in response to one of those letters "saying that they looked into it, and they found no merit." (*Id.* at 178).

Plaintiff transferred from the CNYPC to Sullivan in June 2017. (Dkt. No. 121-2, at 3). There, he told a counselor "about what happened at Great Meadow." (Dkt. No. 122-2, at 180–81). By March 2018, however, he had not received a satisfactory response from DOCCS, and so he wrote three identical letters to OSI, the DOCCS commissioner, and then-Governor Andrew Cuomo.[3] (Dkt. Nos. 122-4, 122-5, 122-6; *see also* Dkt. No. 122-2, at 169, 175). In the subject lines, Plaintiff stated that he was complaining of "Sexual & Physical Assault/Harassment Religious Violation Destruction of Property Denial Meals." (Dkt. No. 122-6, at 1). In the body of the letters, Plaintiff described some details of Slattery's and Quain's assault, as well as his suicide attempt. (*Id.* at 3–4). He also recounted:

> My commissary items were taken and given to other inmates, honey, toothpaste and different substances were sprayed on my clothing, legal documents, pictures, were thrown in the toilet, and when they were finished, I was order[ed] to clean it up in fifteen minutes or there would be hell to pay.

(*Id.* at 3). At the end, Plaintiff requested an investigation, as well as information concerning the Great Meadow COs working during the relevant times. (*Id.* at 6). He explained that COs had "sexually and physically molested/assaulted" him and "destroy[ed]" his "religious, personal and legal property." (*Id.*). The letters did not specifically mention any CO exposing their genitalia, or that his property had been destroyed through a CO urinating on it. (*See id.*).

Plaintiff acknowledges that he never filed an official grievance concerning his First Amendment claim. (*See* Dkt. No. 122-10, ¶ 8; *see also* Dkt. No. 121-2, at 4, 7–8).

---

[3] Plaintiff wrote another letter to the DOCCS commissioner in October 2019, after he had been transferred to Green Haven Correctional Facility. (*See* Dkt. No. 122-7, at 1). Although this letter mentioned that Plaintiff "was verbally, physically, and sexually assaulted, and harassed by the staff at Great Meadow," as well as that he attempted suicide there, it principally concerned a request to return to Sullivan. (*See id.* at 1–3).

7

### III. STANDARD OF REVIEW

Under Rule 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*, 477 U.S. at 248). The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (per curiam) (explaining that summary judgment is appropriate where the nonmoving party fails to "'come forth with evidence sufficient to permit a reasonable juror to return a verdict in [their] favor on' an essential element of a claim" (quoting *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010))).

If the moving party meets this burden, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323–24; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). Still, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the

8

material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and cannot "rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) (citing *Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985) (per curiam)). Furthermore, "[m]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)).

### IV.  DISCUSSION

The Prison Litigation Reform Act ("PLRA") "instructs that 'no action shall be brought with respect to prison conditions under 42 U.S.C. § 1983 by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.'" *Williams v. Corr. Officer Priatno*, 829 F.3d 118, 122 (2d Cir. 2016) (alterations adopted) (quoting 42 U.S.C. § 1997e(a)). Courts evaluating PLRA exhaustion "must do so on a claim-by-claim basis." *Saeli v. Chautauqua Cnty.*, 36 F.4th 445, 459 (2d Cir. 2022). "[U]nexhausted claims may not be pursued in federal court." *Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir. 2011); *see also Baltas v. Jones*, 162 F.4th 68, 73 (2d Cir. 2025). Accordingly, as to each claim, "prisoners must complete the administrative review process in accordance with the applicable procedural rules—rules that are defined not by the PLRA, but by the prison grievance process itself." *See Johnson v. Killian*, 680 F.3d 234, 238 (2d Cir. 2012) (per curiam) (quoting *Jones v. Bock*, 549 U.S. 199, 218 (2007)).

Ordinarily, New York prisoners must follow a three-step grievance and appeal process. *See Green Haven Prison Preparative Meeting of Religious Soc'y of Friends v. N.Y. State Dep't of Corr. & Cmty. Supervision*, 16 F.4th 67, 81 (2d Cir. 2021) (describing this process). But under New York regulations implementing the Prison Rape Elimination Act ("PREA"), they "need not

9

follow this three-step procedure" for claims involving sexual abuse. *Hayes v. Dahlke*, 976 F.3d 259, 264 (2d Cir. 2020). Additionally, "prisoners are exempt from the exhaustion requirement when administrative remedies are 'unavailable.'" *Lucente v. Cnty. of Suffolk*, 980 F.3d 284, 311 (2d Cir. 2020) (quoting *Ross v. Blake*, 578 U.S. 632, 642 (2016)).

Plaintiff concedes that he failed to complete the ordinary grievance process. (*See* Dkt. No. 122-10, ¶ 8). Instead, he maintains that he adequately exhausted his remedies under New York's relaxed PREA standard for claims concerning sexual abuse, and that the ordinary grievance process was unavailable to him. (Dkt. No. 122, at 10–18). Defendants disagree. (Dkt. No. 123, at 3–11).

### A.  Applicability of PREA

"Congress enacted PREA with the purpose of implementing standards and policies to prevent prison rape and to 'protect the Eighth Amendment rights of Federal, State, and local prisoners.'" *Does 8–10 v. Snyder*, 945 F.3d 951, 955–56 (6th Cir. 2019) (quoting 34 U.S.C. § 30302(7)); *see also Crawford v. Cuomo*, 796 F.3d 252, 260 & n.9 (2d Cir. 2015). "PREA generally left intact the PLRA's exhaustion requirement, but regulations promulgated pursuant to PREA" relaxed the exhaustion standard. *Snyder*, 945 F.3d at 956 (citation omitted); *see also* 28 C.F.R. § 115.52(b)(1)–(3). Although "not required to adopt" these federal regulations, *Smallwood v. Williams*, 59 F.4th 306, 319 n.7 (7th Cir. 2023), New York has prescribed a similarly relaxed standard.

In New York, prisoners need not "file a grievance concerning an alleged incident of sexual abuse or sexual harassment to satisfy the [PLRA's] exhaustion requirement before bringing a lawsuit regarding an allegation of sexual abuse." N.Y. Comp. Codes R. & Regs. ("N.Y.C.R.R.") tit. 7, § 701.3(i) (citation omitted); *see Hayes*, 976 F.3d at 264. For such claims to be exhausted, "official documentation" must confirm that:

> an inmate who alleges being the victim of sexual abuse or sexual harassment reported the incident [1] to facility staff; [2] in writing to Central Office Staff; [3] to any outside agency [DOCCS] has identified as having agreed to receive and immediately forward inmate reports of sexual abuse and sexual harassment to agency officials under the PREA standards; or [4] to [DOCCS's] Office of the Inspector General.[4]

§ 701.3(i)(1) (citation omitted); *Hayes*, 976 F.3d at 268 n.5. The term "sexual abuse" is defined "as set forth in" the federal PREA regulations. N.Y.C.R.R. tit. 7, § 701.2(j). Those federal regulations in turn define "sexual abuse" to include, as now relevant, "[a]ny display by a staff member, contractor, or volunteer of [their] uncovered genitalia, buttocks, or breast in the presence of an inmate, detainee, or resident." 28 C.F.R. § 115.6.

The Second Circuit has not squarely addressed "exhaustion requirements and PREA grievances when sexual assaults are at issue alongside with non-sexual misconduct." *Haywood v. Annucci*, No. 18-CV-10913, 2022 WL 4357648, at *8, 2022 U.S. Dist. LEXIS 169934, at *21–22 (S.D.N.Y. Sept. 20, 2022). But district courts within the Circuit have generally "concluded that any non-sexual act 'intertwined' with sexual abuse is subject to the relaxed grievance standards." *Id.*, 2022 WL 4357648, at *8, 2022 U.S. Dist. LEXIS 169934, at *22–23 (collecting cases); *see also Santos v. Filighera*, No. 6:22-CV-06338, 2024 WL 2091746, at *6, 2024 U.S. Dist. LEXIS 84649, at *16–18 (W.D.N.Y. May 9, 2024). This accords with the state regulation's text, which covers claims "*concerning* an alleged incident of sexual abuse." N.Y.C.R.R. tit. 7, § 701.3(i) (emphasis added); *see Haywood*, 2022 WL 4357648, at *8, 2022 U.S. Dist. LEXIS 169934, at *22 (noting that "[n]on-sexual acts done to enable, further or magnify the sexual misconduct" "concern" the sexual misconduct (alteration adopted)). Were the rule otherwise, plaintiffs would be forced to "adjudicate" for themselves whether their "allegations of sexual

---

[4] As the New York attorney general's office has explained in other litigation, the "Office of the Inspector General is the former name of the OSI." *See Rainey v. Luther*, No. 9:23-cv-0027, 2025 WL 2784055, at *7 n.11, 2025 U.S. Dist. LEXIS 147263, at *20 n.11 (N.D.N.Y. July 31, 2025).

11

assault were sufficient under PREA" and therefore subject to § 701.3(i). *Henderson v. Annucci*, No. 14-CV-445A, 2016 WL 3039687, at *5, 2016 U.S. Dist. LEXIS 33470, at *15–16 (W.D.N.Y. Mar. 14, 2016), *report-recommendation adopted*, 2016 WL 3031353, at *1, 2016 U.S. Dist. LEXIS 69842, at *3 (W.D.N.Y. May 27, 2016); *see also Haywood*, 2022 WL 4357648, at *8, 2022 U.S. Dist. LEXIS 169934, at *22.

Here, Plaintiff argues that the relaxed standard applies because Quain, "[i]mmediately after" the pat frisk assault, "entered Plaintiff's cell and destroyed his religious and other property . . . by exposing his genitalia and urinating on Plaintiff's belongings."[5] (Dkt. No. 122, at 12–13). To be sure, Quain's tossing Plaintiff's cell occurred right after the pat frisk assault. (*See* Dkt. No. 122-2, at 50–51). But they appear to be two separate incidents. Quain could not have tossed the cell "in an effort to enable the [pat frisk] assault" that had already occurred, nor did the two actions occur "in concert with one another." *See Haywood*, 2022 WL 4357648, at *8, 2022 U.S. Dist. LEXIS 169934, at *22–24. According to Plaintiff's testimony, Quain ended the pat frisk assault, told Plaintiff to "stand on the wall" to face his cell, and then started the toss during which he urinated on Plaintiff's religious materials. (*See* Dkt. No. 122-2, at 50–51; Dkt. No. 122-3, at 93–101, 102; Dkt. No. 122-8, ¶ 2). Thus, the destruction of religious materials does not appear "intertwined" with the pat frisk assault as courts in this Circuit have applied that standard.

However, Quain accomplished the alleged First Amendment violation—urinating on, and thereby destroying, Plaintiff's religious materials—through "display[ing] [his] uncovered

---

[5] Defendants assert that this "allegation is contradicted by [Plaintiff's] own evidence and his own deposition testimony relating to his current claims." (Dkt. No. 123, at 10). But they have not moved for summary judgment on the merits of Plaintiff's First Amendment claim, (Dkt. No. 121-3, at 3), and the Court cannot make credibility determinations at this stage, *see Jeffreys*, 426 F.3d at 553–54. There is sufficient evidence in the record for a reasonable jury to conclude that this conduct occurred. Plaintiff testified in 2021 that Quain "pissed . . . all over [Plaintiff's] stuff that [Quain] had thrown in [the] toilet." (Dkt. No. 122-2, at 51). And in his declaration opposing summary judgment—which is, at most, "only arguably contradictory" to his deposition testimony, *see Brandon v. Kinter*, 938 F.3d 21, 33 n.9 (2d Cir. 2019) (quoting *Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 620 (2d Cir. 1996))—Plaintiff clarifies that his "religious materials were among the items Quain threw in the toilet and urinated on." (Dkt. No. 122-8, ¶ 2).

12

genitalia . . . in the presence of" Plaintiff, a distinct act of "sexual abuse" under the applicable regulations. 28 C.F.R. § 115.6; *see* N.Y.C.R.R. tit. 7, § 701.2(j). Although not intertwined with the pat frisk assault, the First Amendment claim nevertheless "concern[s] an alleged incident of sexual abuse," so the relaxed standard applies. *See* N.Y.C.R.R. tit. 7, § 701.3(i). In light of this conclusion, the parties agreed at oral argument, the Court need not determine whether the ordinary grievance process was unavailable. Because the First Amendment claim falls within PREA, Plaintiff was not obligated to use the ordinary grievance process.[6]

### B. Plaintiff's Exhaustion Efforts

However, that does not end the inquiry. As Defendants note, Plaintiff must still have adhered to § 701.3(i)'s exhaustion requirements. (Dkt. No. 123, at 7–8). When "[s]tate law does not specify what information a grievance should contain," the "PLRA provides the answer." *Edwards v. Arocho*, 125 F.4th 336, 347 (2d Cir. 2024); *see also Espinal v. Goord*, 558 F.3d 119, 127 (2d Cir. 2009). New York law specifies some content requirements for complaints submitted through the ordinary grievance process. *See* N.Y.C.R.R. tit. 7, § 701.5(a)(2). But all § 701.3(i) requires is that a prisoner "report[] the incident" in one of the ways described above. No party has pointed to any other applicable standard. Thus, the general PLRA requirements concerning grievance contents apply. *See Edwards*, 125 F.4th at 347.

"Exhaustion under the PLRA requires that a prisoner plaintiff 'alert the prison to the nature of the wrong for which redress is sought.'" *Baltas*, 162 F.4th at 72–73 (alteration adopted) (quoting *Edwards*, 125 F.4th at 347); *Espinal*, 558 F.3d at 127. "A grievance is thus similar to 'notice pleading' in that it need only 'object intelligibly to some asserted shortcoming'"; a grievant need not "lay out the facts, articulate legal theories, or demand particular relief."

---

[6] Plaintiff does not appear to challenge the PREA exhaustion procedure's availability. (*See* Dkt. No. 122, at 15).

13

*Edwards*, 125 F.4th at 347 (quoting *Johnson v. Testman*, 380 F.3d 691, 697 (2d Cir. 2004)). Rather, grievances must contain information "sufficient to advance the 'benefits of exhaustion.'" *Espinal*, 558 F.3d at 127 (quoting *Jones*, 549 U.S. at 219). "In order to exhaust, therefore, inmates must provide enough information about the conduct of which they complain to allow prison officials to take appropriate responsive measures." *Baltas*, 162 F.4th at 73 (quoting *Johnson*, 380 F.3d at 697).

Here, Plaintiff asserts that his "letters to Governor Cuomo, DOCCS Commissioner Annucci, and OSI establish a dispute of material fact as to whether" he exhausted his First Amendment claim under § 701.3(i). (Dkt. No. 122, at 11). To be sure, those letters reflected that, in late March 2017, Plaintiff was sexually assaulted and his religious materials were destroyed.[7] (*See* Dkt. No. 122-6, at 1–3, 6). However, they described only the following of Quain's tossing Plaintiff's cell: "My commissary items were taken and given to other inmates, honey, toothpaste and different substances were sprayed on my clothing, legal documents, pictures, were thrown in the toilet . . . ." (*Id.* at 3). That description omitted that Quain had exposed himself to Plaintiff during the toss; nor did it accuse him of urinating on anything, much less on Plaintiff's religious materials. (*See id.*). The letters therefore failed to sufficiently "alert the prison to the nature of the wrong," or give officials an opportunity "to take appropriate responsive measures" to Quain exposing his genitals to Plaintiff. *Baltas*,162 F.4th at 72–73.

Plaintiff also testified in his 2021 deposition that he discussed his claims with an OSI official—who had come "about another incident" concerning a different prisoner—and "told [CNYPC staff] everything." (*See* Dkt. No. 122-2, at 178–80). He also confirmed that he wrote

---

[7] The commissioner and OSI letters bear DOCCS "received" stamps, so § 701.3(i)'s "official documentation" requirement is satisfied. (Dkt. No. 122-5, at 1; Dkt. No. 122-6, at 1).

14

letters at CNYPC and made "verbal complaints" to a counselor at Sullivan "about what happened at Great Meadow." (*Id.* at 175–78, 180–81). But no "official documentation" in the record confirms these complaints, *see* § 701.3(i), and Plaintiff does not argue that this testimony establishes a dispute of material fact as to PREA exhaustion. (*See* Dkt. No. 122, at 11). Even if he had, such "'conclusory statements' [would] not suffice to defeat summary judgment." *See Moll v. Telesector Res. Grp., Inc.*, 94 F.4th 218, 228 (2d Cir. 2024) (quoting *Davis v. New York*, 316 F.3d 93, 100 (2d Cir. 2002)).

In light of the above, on the current summary judgment record, Plaintiff has failed to raise a genuine dispute of material fact concerning exhaustion of his First Amendment claim under the relaxed PREA standard.

### C. New Issues Raised at Oral Argument

In their briefing, Defendants urge the Court to dismiss Plaintiff's First Amendment claim with prejudice. (Dkt. No. 121-3, at 8–9; Dkt. No. 123, at 11). Ordinarily, dismissal with prejudice is warranted "where administrative remedies were available for a reasonable length of time and were not exhausted 'in the absence of any justification.'" *Rodriguez v. Westchester Cnty. Jail Corr. Dep't*, 372 F.3d 485, 487 (2d Cir. 2004) (quoting *Berry v. Kerik*, 366 F.3d 85, 88 (2d Cir. 2004)). But "[i]f the time permitted for pursuing administrative remedies has not expired," a prisoner may "cure the defect simply by exhausting them and then reinstating his suit." *Berry*, 366 F.3d at 87 (quoting *Snider v. Melindez*, 199 F.3d 108, 111–12 (2d Cir. 1999)). Under those circumstances, "dismissal without prejudice is appropriate." *Id.*

Here, § 701.3(i) provides that "[a] sexual abuse or sexual harassment complaint may be submitted at any time." As explained above, § 701.3(i) applies to Plaintiff's First Amendment claim. Under the plain language of this provision, Plaintiff's complaint could still be submitted. Neither party disagreed with this proposition at oral argument. Accordingly, Plaintiff's

15

administrative remedies have not "become unavailable," and "dismissal without prejudice [appears] appropriate." *See Berry*, 366 F.3d at 87, 88.

But when questioned on this issue at oral argument, Defendants argued for dismissal with prejudice on an alternative basis: that Plaintiff's First Amendment claim, even asserted in an amended complaint after proper exhaustion, would be untimely under the three-year statute of limitations for New York-based § 1983 claims. *See, e.g.*, *Lucente*, 980 F.3d at 308. Therefore, they argued, amendment would be futile. Plaintiff responded that he would be entitled to tolling.[8] And his counsel represented that documentation—not in the summary judgement record—reflects that OSI investigated the incident underlying the First Amendment claim. Such documentation would be relevant to any tolling analysis, as well as the PREA exhaustion analysis. And without it, the Court cannot determine whether Defendants are entitled to partial summary judgment, or whether dismissal should be with or without prejudice. It therefore declines to rule on Defendants' request for dismissal at this time.

## V.   CONCLUSION

For these reasons, it is hereby

**ORDERED** that the Court defers decision on Defendants' motion for partial summary judgment (Dkt. No. 121) pending further briefing; and it is further

**ORDERED** that the parties are directed to meet and confer on the issues raised at oral argument, and file a joint status report by February 27, 2026 outlining their respective positions, each supported by applicable caselaw if they disagree. The status report should address the issues

---

[8] The Court notes that Plaintiff's original pro se complaint described the factual basis for his First Amendment claim. (*See* Dkt. No. 1, at 5 ("[D]efendant #2 went in my cell and began to rip up my religious materials as well as personal property[,] throwing my pictures, religious articles, [and] legal documents in the toilet, [and] urinated on them.")).

16

identified in the February 9, 2026 minute entry and whether the parties believe the Court must hold an exhaustion hearing.

**IT IS SO ORDERED.**

Dated: February 10, 2026
Syracuse, New York

Brenda K. Sannes
Chief U.S. District Judge